UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| DANIEL WILLIAM THARP, | ) | CASE NO. 1:10 CV 1283 |
| | ) | |
| Plaintiff, | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION |
| | ) | AND ORDER |
| PERRY LOCAL SCHOOL DISTRICT, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

Pro se plaintiff Daniel William Tharp filed this in forma pauperis action against the Perry Local School District in Ohio, Perry Board of Education, Ohio Association of Public School Employees (OAPSE), Local #367, and Perry Village Police Department. Mr. Tharp alleges the defendants discriminated against him in retaliation for exercising his First Amendment right to free speech in violation of the 42 U.S.C. § 1983 and Title VII, 42 U.S.C. § 2000e. He also brings state law causes of action for defamation and intentional infliction of emotional distress. Plaintiff seeks compensatory and punitive damages totaling $7,800,000.00.

*Background*

Mr. Tharp was employed as a day-shift custodian at Perry High School in 2003. That

year, Perry Superintendent Tim Berkey and Doug Jenkins[1] called plaintiff to meet on September 5, in the High School Principal's office. During the meeting, they explained that "a highly respected visible person that does a lot for the community has some serious accusations towards you." (Compl. at 1.) When Mr. Tharp questioned the nature of the complaint, he was only told they needed to investigate the issue and that "there could be some serious charges to follow." (Compl. at 1.) Dr. Berkey suggested plaintiff move to the 3rd shift until the investigation was completed. Mr. Tharp protested that it would appear he was already guilty if he agreed to the change. Instead, he requested and was authorized to take two weeks paid vacation during the investigation.

Two weeks later, plaintiff met with Mr. Jenkins, "Steve Rogaski for Perry Schools," and Union President Cindy Gant at Perry High School ("the High School"). He was advised that the investigation was still not complete. Again, it was suggested he move to the 3rd shift. Mr. Tharp resisted the suggestion and requested an additional two weeks paid leave while the investigation continued. Mr. Jenkins immediately telephoned Dr. Berkey who authorized the additional leave. Before the meeting ended, Mr. Jenkins mentioned that plaintiff's office had been searched thoroughly, but they needed the key to two locked spaces in the room. Because only Mr. Tharp had the key, Mr. Jenkins asked him to surrender it so the area could be examined. All the meeting participants accompanied plaintiff to his office on the loading dock of the high school. Mr. Jenkins searched the locked space and "FOUND NOTHING." Mr. Jenkins then suggested Mr. Tharp meet with Perry Police Chief Liggit as soon as possible.

Plaintiff telephoned the Chief the next day to set up a meeting. The following day

---

[1]Although Doug Jenkins is mentioned several times in the complaint, Mr. Tharp does not identify his title or for whom he worked.

Mr. Tharp met with Chief Liggit in his office. The Chief asked if plaintiff knew why he was there. When Mr. Tharp answered he did not, Chief Liggit explained, "you have been accused of some serious crimes, Stalking & Menacing, that is big trouble." (Compl. at 2.) When the Chief asked him about "some pictures in a scrap book," Mr. Tharp stated Karen Altenwig and Debbie Gutowski took the photographs. The Chief questioned the truthfulness of plaintiff's statements and suggested plaintiff resolve his concerns by taking a voice stress test. Plaintiff agreed and Chief Liggit promised to telephone him once he arranged a meeting with the Lake County detective.

Mr. Tharp left the meeting and immediately contacted his lawyer, Greg Gilson. He asked Mr. Gilson if he needed to accompany him to the stress test. The attorney advised he did not need to be present.

The following Monday, Mr. Tharp met with Lake County Detective Walters at the Lake County Sheriff's Department. Mr. Tharp sat across from Detective Walters while he conducted the voice stress test in a small room on the third floor of the Sheriff's Office. The testing process was explained to Mr. Tharp in detail. After answering the five questions proposed, Detective Walters left the room for a second opinion, as he had explained to the plaintiff. When Detective Walters returned, he was accompanied by Chief Liggit. The detective grabbed a photo album from his shelf before sitting behind his desk across from the plaintiff. He slammed the album open in front of Mr. Tharp and asked why the plaintiff "was taking these provocative photographs of young female Perry student athletes." (Compl. at 2-3.) Mr. Tharp denied taking the photographs. "Detective Walters looked @ Chief Liggit and said to him 'I thought you said he took those pictures.' Chief Liggit looked at [Mr. Tharp] and looked back at Detective Walters and shrugged his shoulders. Detective Walters then proceeded to say, well it looks like we have to do another voice

3

stress test on these pictures." (Compl. at 3.) Mr. Tharp was flabbergasted, but agreed to a second voice stress test.

Detective Walters asked "5 more derogatory questions about some pictures that I never took." (Compl. at 3.) Again, the detective left the room for a second opinion and returned 10-15 minutes later with Chief Liggit. Immediately after entering the room, Detective Walters threw a pad of paper on the desk in front of Mr. Tharp demanding his resignation from the High School. The detective suggested Mr. Tharp resign to avoid embarrassing the school, his family and himself. Mr. Tharp began crying and explaining he needed his job and could not resign. Plaintiff also suggested "Ray Sines was behind all this mess."[2] (Compl. at 3.) Detective Walters answered, "Yes, it was his niece and he is my boss and you have to go." (Compl. at 3.) Mr. Tharp asked if he was free to leave the room, and Detective Walters "sarcastically" agreed.

Mr. Tharp immediately telephoned his attorney about the exchange with Detective Walters and Chief Liggit. Mr. Gilson promised: "I'll take care of it Danny, but it's going to cost you a $1000.00." (Compl. at 3.) The next morning, Mr. Gilson met with Chief Liggit, who allegedly stated "there were no issues. Greg Gilson called me back and said it was DONE, period!!" (Compl. at 3.)

In early October 2003, Mr. Tharp filed a grievance with the OAPSE. At some point, plaintiff was reassigned to work on the 3rd shift.[3] He met with Superintendent Representative Pat

---

[2]In a preliminary statement to the complaint, Mr. Tharp identifies Ray Sines as a lobbyist and friend of Dr. Berkey, who "was going to Columbus, Ohio, looking out for Perry School's best interest in tax dollars, . . . making $60,000 per year doing so. While . . . employees were taking pay freezes 6 years in a row." (Pl.'s Statement).

[3]Throughout the complaint, Mr. Tharp protested any suggestion of a reassignment to the
(continued...)

East, Cindy Gant, Union VP Denise Prior, Doug Jenkins and Steve Rogaski in the first stage of the grievance process. Mr. Tharp argued that the defendants' investigation was without merit and, therefore, he was entitled to be reinstated to the day shift. Within weeks, he received a written decision denying his grievance. He proceeded to the second level of the process and was again denied. The next stage involved a meeting before the entire Board of Education to plead his case.

Before opting to proceed to the final grievance level, the Union President contacted Mr. Tharp with a message from Dr. Berkey. She allegedly stated Dr. Berkey would assign plaintiff to the next available day shift position at the community fitness center, if he agreed to drop his grievance. Mr. Tharp believed the position would be available shortly because another co-worker would soon be retiring to the 3rd shift. So, "on the advise [sic] of Lloyd Raines, my state Representative from OAPSE and Cindy Gant I agreed to drop me [sic] 3rd a[nd] final grievance step." (Compl. at 4.)

In February or March 2004, Dr. Berkey's assistant called Mr. Tharp to schedule a personal meeting. When Mr. Tharp arrived he was ushered directly to Dr. Berkey's office, who greeted him warmly and sat beside plaintiff in front of his desk. Dr. Berkey allegedly apologized profusely to Mr. Tharp. He implored: "Please Danny, what can I do to make you happy? I want the old Danny back." (Compl. at 5.) He suggested Mr. Tharp contact the Director Maintenance Jim Smith to "see if there was a job that would suit me, that would make me happy." (Compl. at 5.) The apologies and offers of help continued for 45 minutes. Dr. Berkey also allegedly disclosed, a

---

$^{3}$(...continued)
3rd shift. The complaint alleges he successfully insisted on paid vacation during the investigation in lieu of reassignment to the 3rd shift. Therefore, it is not clear when or under what circumstances he was reassigned.

"particular woman [was] all over his case," requesting his travel and credit card records

For reasons unexplained, Mr. Tharp did not contact Jim Smith. He also claims he never met with Dr. Berkey again. Plaintiff later saw Dr. Berkey being confronted by an angry group of constituents in the school cafeteria, led by the woman to whom he referred in their meeting. Dr. Berkey resigned as Superintendent that evening. Before leaving town, however, he appointed "someone to the day position at the Community Fitness Center." Plaintiff complains this left him stuck in the 3rd shift position.

While stopped at a traffic light in his car in June 2007, Mr. Tharp heard a man yelling and running toward him. Within 6 feet of his car door, the man yelled: "Get out of that truck . . . you're the SOB that was [sic] taking pictures of female students at Perry School years ago. . . . Get out of that truck so that I can KILL you MF." (Compl. at 5.) The light changed before the man reached Mr. Tharp, who slowly moved on with the traffic. That evening, Sheriff Seamon arrived at plaintiff's house. He explained the Sheriff's department received a complaint about the plaintiff "taking pictures of female students a couple years ago . . . and that you were walking around such & such home taking pictures of their property." (Compl. at 5.) Sheriff Seamon advised Mr. Tharp to stay away from the property on Call Road in Perry, Ohio. Mr. Tharp protested there was no reason for him to avoid any area because the charges against him were "trumped up" and to contact Detective Walters. "There was never not [sic] one more peep about it from anyone." (Compl. at 6.)

Less than one year later, an unidentified person in the community began telephoning residents to warn parents to watch their children because "Danny Tharp" had been moved to Perry Middle School. The warnings allegedly mentioned he had done "such & such years ago @ Perry Schools." (Compl. at 6.) Moreover, written complaints read: "[W]hy is Danny Tharp working in

6

the schools when he has been doing this & that?" (Compl. at 6.)  The Perry School Board and Police Department began receiving complaints.  Superintendent Michael Sawyers contacted Mr. Tharp to advise, "before you get blindsided [sic] . . . there has been one or more community members calling and using your name unduly. . . . We have sent letters out to Perry parents to stop the inuendos [sic] and false accusations." (Compl. at 6.)

Three weeks after his conversation with Mr. Sawyers, Mr. Tharp was discussing the allegations with Police Lieutenant Michael Schank, who was working on plaintiff's roof at the time.  Lt. Schank said he was the investigating officer on all the complaints and stated "I will get them, I will find the person or persons responsible, I'm going to charge them, prosecute them and I want you to sue them." (Compl. at 6.)  Mr. Tharp thanked the officer, but his later attempts to get an answer from the department were unsuccessful.  "It was forgotten about for some reason." (Compl. at 6.)  Because of the stress of the accusations and anxiety over his safety, Mr. Tharp resigned from his custodial position on October 8, 2008.  Twenty months later he filed the above-captioned case.

*Analysis*

Mr. Tharp claims he was a model employee for 12 years before Superintendent Berkey arrived in May 2003.  At that time, he accused Dr. Berkey of hiring his friends without interviews and/or proper certification for the positions to which they were appointed.  He alleges the whole community was dissatisfied, but he was the only one who voiced his opinion "loud and clear."[4]  He believes his First Amendment right to free speech was violated when unfounded charges were brought against him.  Moreover, Mr. Tharp believes the charges were in retaliation for speaking out against Dr. Berkey and his friends, which included Ray Sines.

---

[4]Mr. Tharp does not disclose the forum or context in which he expressed his concerns.

*Standard of Review*

Although pro se pleadings are liberally construed, Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam); Haines v. Kerner, 404 U.S. 519, 520 (1972), the district court is required to dismiss an action under 28 U.S.C. §1915(e) if it fails to state a claim upon which relief can be granted, or if it lacks an arguable basis in law or fact. Neitzke v. Williams, 490 U.S. 319 (1989); Lawler v. Marshall, 898 F.2d 1196 (6th Cir. 1990); Sistrunk v. City of Strongsville, 99 F.3d 194, 197 (6th Cir. 1996). For the reasons stated below, this action is dismissed pursuant to section 1915(e).

*Civil Rights - First Amendment*

A claim of retaliation in violation of the First Amendment, requires a showing that (1) plaintiff engaged in a constitutionally protected activity; (2) the defendant's action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in the activity; and (3) the adverse action was motivated-at least in part-by the plaintiff's exercise of his constitutional rights. Timm v. Wright State Univ., 375 F.3d 418, 422-23 (6th Cir.2004) (citing Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir.1998)).

Mr. Tharp asserts he exercised his right to free speech when he spoke out against the actions and activities of Tim Berkey in 2003. Even accepting as true that this was 'constitutionally protected' speech, plaintiff has not articulated what 'chilling' action the defendants took to discourage him from exercising his First Amendment rights. While it is clear he believes the accusations against him in September 2003 were in retaliation for being outspoken, he does not allege they prevented him from exercising his right to free speech. Instead, as he explains once the charges were dropped, Mr. Tharp immediately pursued a grievance through the OAPSE.

8

Plaintiff also does not point to his reassignment to the 3rd shift as the chilling injury. He does not state who decided to reassign him to the 3rd shift or whether he originally agreed to the reassignment. The fact that his efforts to be reinstated were denied during a formal grievance process suggests the decision was not without some merit. It was his decision to later abandon his final appeal for reinstatement. Even if the court were to construe his decision as "the chilling effect," Mr. Tharp does not characterize the decision as such. Instead, he claims he willingly abandoned the appeals process in favor of an offer that "led for the door to open in a few months for me to get a better day position than I had before." (Compl. at 4.)

Finally, the circulation of rumors about Mr. Tharp that followed shortly thereafter is not considered an adverse employment action. The Sixth Circuit has held that such activity does not rise to the level of a hostile work environment, but is the kind of "minor harassment" that is not actionable in constitutional cases. See Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir.1999); Mattox v. City of Forest Park, 183 F.3d 515, 521 (6th Cir.1999). Even if the defendants did attempt to discourage Mr. Tharp from exercising his First Amendment rights, the facts allege that the injurious act occurred well beyond the statute of limitations in a civil rights case.

*Time-Barred*

Because Congress did not specify a statute of limitations for claims made pursuant to § 1983, this court must borrow the statute of limitations governing personal injury claims in Ohio. Banks v. City of Whitehall, 344 F.3d 550, 553 (6th Cir.2003) (holding that "federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought"). In Ohio, the appropriate limitations period for civil rights actions brought under § 1983 is two years. OHIO REV. CODE. ANN. § 2305.10; Browning v. Pendleton, 869

9

F.2d 989, 992 (6th Cir.1989) ( en banc ).  When the statute of limitations begins to run, however, depends on the nature of the claim under § 1983. Heck v. Humphrey, 512 U.S. 477, 489 (1994) (holding that a § 1983 claim for malicious prosecution does not accrue "until the criminal proceedings have terminated in the plaintiff's favor").

Here, the statute of limitations began to run when Mr. Tharp knew or should have known he suffered a cognizable injury caused by defendants' alleged actions. At the latest, Mr. Tharp knew or should have known that the defendants were attempting to interfere with his rights when he was transferred to the 3rd shift. This was more than seven years before he filed this lawsuit in 2010. McGee v. Schoolcraft Community College, No.04-1924, 2006 WL 126735, at *9 (6th Cir. Jan. 18, 2006). Accordingly, Mr. Tharp's § 1983 claims are also time-barred.

## *Title VII*
## *Discrimination/Retaliation*

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin.  Mr. Tharp has not identified any protected class within which he falls.  More importantly, there is no allegation that the defendant's actions were motivated by Mr. Tharp's race, color, religion, sex, or national origin. Based on the foregoing, he has failed to state an actionable claim of discrimination under Title VII.

The anti-retaliation provision of Title VII forbids "discriminat [ion] against" an employee or job applicant who, inter alia, has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a).  The antiretaliation provision covers only those employer actions that would have been materially adverse to a reasonable employee or applicant. The Supreme Court has explained that this requires a retaliation plaintiff to show that the

challenged action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53(2006)(quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

As noted above, the circulation of rumors is not considered an adverse action for employment discrimination purpose. The only protected activity Mr. Tharp has marginally asserted is his protest against the actions of a former Perry Superintendent. The court has already addressed his failure to state a timely claim of retaliation for asserting his First Amendment rights. Close examination of the complaint does not reveal Mr. Tharp engaged in any activity protected by Title VII, and certainly none that resulted in the defendant taking an adverse action against him.

Finally, Mr. Tharp does not allege the defendants pressured him to resign. Instead, he alleges the Superintendent and the Police attempted to squelch any false rumors leveled against him. It appears he was also reassigned from the High School at some point. If Mr. Tharp were claiming constructive discharge, the actionable wrong would arise if his employer "intentionally create[d] an intolerable work atmosphere that force[d] an employee to quit involuntarily." Flaherty v. Metromail Corp., 235 F.3d 133, 138 (2d Cir.2000). Mr. Tharp does not allege his employer intentionally created an intolerable working atmosphere at the time he resigned. There is no causal connection between Mr. Tharp's decision to resign from his position and the actions of the defendants in 2008. See also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"). In sum, the plaintiff has failed to state a claim under Title VII's antiretaliation provision, or that he was constructively discharged in 2008.

*Conclusion*

Accordingly, plaintiff's Motion to Proceed In Forma Pauperis is granted and this action is dismissed under 28 U.S.C. § 1915(e), but without prejudice to any state law claim Mr. Tharp may have under the facts alleged. The court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.[5]

IT IS SO ORDERED.

s/ Kathleen M. O'Malley
KATHLEEN M. O'MALLEY
UNITED STATES DISTRICT JUDGE

DATED: November 22, 2010

---

[5] The statute provides: "An appeal may not be taken in forma pauperis if the trial court certifies that it is not taken in good faith." 28 U.S.C. § 1915(a)(3).